IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| ESTATE OF JULIANNE CROOKSTON,<br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br>Defendant.<br><br>UNITED STATES OF AMERICA,<br>Counterclaim/Third-Party Claim Plaintiff,<br><br>v.<br><br>ESTATE OF JULIANNE CROOKSTON, SIDNEY CROOKSTON, and SID CROOKSTON, LLC,<br>Counterclaim/Third-Party Claim Defendants. | MEMORANDUM DECISION AND ORDER AFTER A BENCH TRIAL: FINDINGS OF FACT AND CONCLUSIONS OF LAW<br><br>Case No. 1:21-cv-00102-JNP-DAO<br><br>Chief Judge Jill N. Parrish |

The United States of America filed notices of tax liens against the Naomi Circle property owned by Julianne Crookston (Julianne), asserting a right to recover against the value of the property for unpaid taxes owed by Sid Crookston, LLC (Sid Crookston Construction). Julianne sued the United States to quiet title to the property. Soon thereafter, she passed away and the court substituted her estate (the Estate) as the plaintiff in this action. The United States filed counterclaims against the Estate, asserting a right to foreclose on the tax liens on the property. The government argues that it can seize the property as payment towards Sid Crookston Construction's tax liability under four distinct legal theories under Utah law: (1) a constructive trust/equitable lien, (2) a purchase money resulting trust, (3) a nominee theory, and (4) fraudulent transfer.

The government previously moved for summary judgment in its favor. The court granted the motion in part, ruling that Sid Crookston Construction held an equitable lien[1] for the payments that it made toward the mortgage and the property taxes for the Naomi Circle property, totaling $155,321.11. The court ruled that the government could enforce its tax liens against the property up to that amount. The court denied summary judgment to the extent that the government sought to enforce its tax liens on the property for additional amounts. The court subsequently held a bench trial on the remaining tax lien issues.

The court concludes that in addition to the $155,321.11 equitable lien that it ordered in the summary judgment ruling, Sid Crookston Construction also holds an equitable lien in the amount of $90,967.38 against the Naomi Circle property. Accordingly, the government may enforce its tax liens against the property up to a total of $246,288.49. The court concludes that the government has not proven that Sid Crookston Construction holds property rights under its purchase money resulting trust, nominee, or fraudulent transfer theories. Thus, the government may not recover additional amounts under any of these theories.

## FINDINGS OF FACT

### *A. Sid Founded Sid Crookston Construction in the Late 1980s or Early 1990s*

1. Sid Crookston (Sid) started Sid Crookston Construction in the late 1980s or early 1990s. Bench Trial Transcript (Tr.) 268:3–17.

---

[1] The court used the term "constructive trust" in its summary judgment order. However, because the court found that the government had a security interest in the Naomi Circle property rather than a possessory interest, the remedy provided by the summary judgment order was technically an equitable lien. The court discusses the differences between a constructive trust and an equitable lien in the Conclusions of Law section of this order.

2. Beginning in the early 2000s, Sid was the sole owner of Sid Crookston Construction. Tr. 269:15–122; Trial Exhibit (Ex.) 245.

3. Sid signed financial and loan documents on behalf of Sid Crookston Construction. Exs. 225, 228, 277, 278.

4. Sid Crookston Construction focused mostly on excavation, framing, red iron, and concrete work. Tr. 271:19-272:5.

*B. Sid Purchased an Undeveloped Lot in 2007*

5. In the summer of 2007, Sid purchased a parcel of land located at 2870 Naomi Circle in Logan, Utah. Ex. 305; Tr. 328:24–329:4.

6. On July 31, 2007, a warranty deed conveying the property to Sid was recorded. Ex. 305.

7. Sid funded the acquisition with a purchase-money loan from Cache Valley Bank in the amount of $132,000. Ex. 306.

8. Sid obtained the lot for personal use with the intention to build a house on the property or sell the lot at the end of the following year. Ex. 306, p. 3; Tr. 331:10–14.

9. In August 2008, Sid obtained an extension on the purchase-money loan. Ex. 260.

10. Around the same time, Sid Crookston Construction made payments totaling $3,349 toward interest and a modification fee for Sid's purchase-money loan. Tr. 54:19–56:1.

*C. Sid Transferred the Lot to Julianne in 2008*

11. In November 2008, Sid was engaged to marry Julianne Jackson. Julianne was born into the Sackett family, which owned a successful construction company called LeGrand Johnson. Tr. 393:3–10.

12. In November 2008, Julianne obtained an $895,000 construction loan from Cache Valley Bank to build a home on the undeveloped lot owned by Sid. Ex. 5.

13. On November 12, 2008, Sid transferred title to the lot to Julianne via quit claim deed. Ex. 6; Tr. 338:8–17. As part of the transaction, Julianne assumed Sid's purchase-money loan with Cache Valley Bank. Ex. 11; Tr. 142:1–6.
14. Julianne used funds from the construction loan to pay off the remaining $134,236.69 owed on the purchase-money loan for the lot. Exs. 12, 264, p. 1; Tr. 141:22–142:6. The lot was worth about $120,000 at the time that Julianne acquired it from Sid. Ex. 38; Tr. 583:11–13.
15. In December 2012, Julianne obtained an $845,000 bridge loan from Cache Valley Bank for construction of the home on the property. Ex. 19; Tr. 101:16–102:3.
16. Julianne paid off the remaining balance due on the 2008 construction loan using funds from the 2012 bridge loan. Ex. 19, p. 2.

*D. Julianne Constructed a Home on the Lot Between 2009 and 2012*

17. Sid and Julianne married in September 2009, and Julianne changed her last name to Crookston. Tr. 302:21–25, 397:22–23.
18. Julianne hired Sid Crookston Construction to be the general contractor for construction of a home on the lot. Ex. 264, p. 2; Tr. 80:19–24, 349:3–6, 504:1–4.
19. Construction began in 2009 and was completed in 2012. Tr. 243:13–16, 266:2–5, 364:2–8, 516:6–7.
20. Subcontractors were hired to perform work on the home and were paid through draws on the 2008 construction loan and the 2012 bridge loan. Tr. 357:19–24.
21. Sid and Julianne moved into the home in early 2013. Tr. 266:1–6.
22. The Naomi Circle property was appraised in 2022 at a value of more than $1.5 million. Tr. 158:2–18.

23. When Julianne hired Sid Crookston Construction to build the home, she understood that it would contribute free labor toward the project. Sid Crookston Construction submitted a general contractor bid for building the Naomi Circle house. Ex. 246. The bid shows general descriptions of the work to be completed on the house (i.e., electrical, paint and finish carpentry, doors, and floor coverings) and corresponding columns for "material," "labor," and "sub bid." Estimates for the cost of the work to be subcontracted to other companies were reflected in the "sub bid" column. Estimated costs for construction materials to be used by Sid Crookston Construction are listed in the "material" column. However, there are no corresponding "labor" costs included for Sid Crookston Construction's work on the house; that column was left blank. Ex. 246.

24. In a credit analysis of Julianne's 2008 construction loan application, Cache Valley Bank stated that the estimated costs of building the house at Naomi Circle "are shown with the market leverage and skills and equipment of Sid Crookston and LeGrand Johnson Company." Ex. 257. The bank estimated the total "construction costs through trade and gift of Johnson and Crookston" to be $300,000. Ex. 257.

25. Sid spent a significant amount of his own time working on the construction of the home. Tr. 345:22–3, 349:7–9. The court finds that Sid performed this work in his personal capacity to help build a marital home that he would share with his wife.

26. Sid's sons, Chris Crookston and Aldon Crookston, and Julianne's son, Bronson Twitchell, worked for Sid Crookston Construction during the period of time that the Naomi Circle home was under construction. Tr. 506:22–507:7.

27. Chris Crookston worked on the house. At times he was paid by Sid Crookston Construction for his work but other times he was just helping his father. Tr. 477:4–6, 478:25–479:9. The

government did not present evidence of the amount of Chris's compensation for time spent working on the home.

28. Bronson Twitchell also performed some work on the Naomi Circle home. He did not remember if he got paid for the work he performed but testified that if he had been paid, it would have been minimum wage. Tr. 261:2–7, 263:21–24.

29. One of the foremen employed by Sid Crookston Construction, Jason Mohr, performed concrete work for the Naomi Circle home in his capacity as an employee of Sid Crookston Construction. Tr. 488:12–13, 490:22–491:5, 503:9–14.

30. Mohr estimated that his work crew would have included eight to ten employees for "pour days" and four to five employees for "prep days." Tr. 530:18–24.

31. Sid Crookston Construction paid Mohr and his crew for their work on the property. Tr. 509:25–510:22. Mohr estimated that he and the members of his work crew each worked for approximately 280 hours on the home and that he was paid an hourly rate in the "mid to upper 20s," while his crew was paid between $14 and $20 per hour. Tr. 515:16–19, 523:17–524:18, 529:10–17, 530:25–531:1.

32. The approximate value of Jason Mohr's labor on the house was $8,400. Tr. 529:10–18.

33. Using the highest values estimated by Mohr, he and his work crew were paid around $64,400 for concrete work on the Naomi Circle home.[2]

34. Sid Crookston Construction made no draws on the construction loan to compensate for the payments it made for its employees' labor on the home. *See, generally* Ex. 247.

---

[2] 280 hours of work performed by Jason Mohr earning $30 an hour and 10 crew members earning $20 an hour.

35. Sid Crookston used his company's construction equipment for the excavation and installation of concrete footings and flooring. When the construction reached above ground phases, such as interior framing, Sid Crookston used his own personal hand tools. Tr. 388:18–389:8.

36. Mohr observed workers using Sid Crookston Construction's equipment to build the Naomi Circle home, including a track hoe, loader, dump truck, grader, excavator, skid steer, and walk behinds. Tr. 508:3–10.

37. The government, however, did not present any evidence regarding the value of the use of this equipment.

38. In April 2011, Sid Crookston Construction took a draw from the 2008 construction loan in the amount of $27,712.11 to pay for concrete provided by LeGrand Johnson. Ex. 247, CVB 00000279, CVB 00000287–88.

39. But Sid Crookston Construction did not use the concrete in the construction of the Naomi Circle home. Instead, it used the concrete to construct a building for Codale Electric, an electrical supply company. In exchange for the concrete, Codale Electric provided materials for electrical work for the Naomi Circle home. Tr. 359:2–20, 361:18–25, 405:12–18, 407:3–408:4; Ex. 247, CVB 00000277, CVB 00000279.

*E. Beginning in 2009, Sid Crookston Construction Stopped Paying its Taxes*

40. Beginning in 2009, Sid Crookston Construction stopped fully paying its federal taxes, penalties, and interest relating to its unemployment taxes (Form 940), employment taxes (Form 941), corporate income tax returns (Form 1120S), and heavy highway vehicle use taxes (Form 2290) despite filing federal tax returns reflecting outstanding liabilities. *See* Ex. 238.

41. The IRS sent Statutory Notices of Balance Due and Statutory Notices of Intent to Levy to Sid Crookston Construction annually beginning in 2010. Ex. 238.

42. On March 12, 2012, Sid, on behalf of himself and Sid Crookston Construction, stipulated with the Utah Department of Public Licensing that he and Sid Crookston Construction were delinquent in paying both state and federal taxes. This stipulation included a provision placing Sid and Sid Crookston Construction's construction licenses on probation. Ex. 239 at DOPL-000100 through DOPL-000108.

*F. Sid Crookston Construction Pays Some of Julianne's Expenses. It Stops Operating in 2016.*

43. Julianne began signing checks on behalf of Sid Crookston Construction in 2014. Exs. 254, 241, 353; Tr. 306:13–307:2, 539:22–540:6.

44. Some of the Sid Crookston Construction checks Julianne signed went to pay her and Sid's personal expenses for the Naomi Circle property, such as utility bills, exterminators, and insurance. Ex. 223 at CacheCty-000022, CacheCty-000034 (property taxes); Ex. 254 at CVB-000493 (power company), CVB-000409 (insurance and power company), CVB-000534 (exterminator, insurance, gas, and power), CVB-000353 (gas); Ex. 252 (gas). Other Sid Crookston Construction employees signed company checks for Julianne's household expenses as well. Ex. 223 at CacheCty-000035–36 (property tax checks).

45. Between January 2014 and June 2016 (when the company ceased doing business), Sid Crookston Construction made direct payments toward the mortgage on the Naomi Circle property in the amount of $134,066.67. *See* ECF No. 123 at 11. It also paid $21,254.44 in property taxes for the property. ECF No. 123 at 4, 11.

46. In July 2016, Sid filed for individual bankruptcy. Tr. 313:23–314:5.

47. Sid Crookston Construction was not a party to the bankruptcy proceedings. By August 2016, Sid Crookston Construction stopped operating. Tr. 322:7–9.

*G. In 2016, ACI Steps into Sid Crookston Construction's Shoes*

48. Immediately after Sid Crookston Construction stopped operating, ACI Construction began operations. Tr. 222:15–16, 433:12–14.

49. Sid's sons, Chris and Aldon, and Julianne's son, Bronson, were the nominal owners of ACI. Tr. 222:10–11, 429:8–11. All three were former employees of Sid Crookston Construction. Tr. 257:15–17, 426:24–427:11, 450:1–9.

50. Many of Sid Crookston Construction's employees, including Sid, began working for ACI. Tr. 267:15–18, 433:15–20, 436:3–6, 498:22–25, 499:9–13

51. ACI used Sid Crookston Construction's office and paid its utilities. Ex. 222.

52. ACI also took over Sid Crookston Construction's construction equipment and any financial obligations for the equipment. Exs. 221 (Sid Crookston Construction loan x1270), 243 (ACI paying loan x1270), 278 (Cache Valley Bank memo attached to x8988 Case Loader loan explaining that ACI "is using most of the Crookston equipment"), 227 (payment on account x8988 shifting from Sid Crookston Construction's account to an ACI account in October 2016), 279 (payment on account x3160 shifting from Sid Crookston Construction's account to an ACI account in November 2016).

53. Both employees of ACI and outsiders viewed ACI as a continuation of Sid Crookston Construction. Tr. 224:19–225:11, 226:2–227:16, 397:10–15, 399:19–400:4, 489:2–10, 498:11–500:24; Ex. 269 (loan document stating that ACI "evolved into the operating entity which replaced Sid Crookston Construction" and Chris, Aldon, and Bronson "are now moving into management positions to run [Sid Crookston Construction] as Sid sorts

through his various financial situations"); Ex. 220 (credit analysis states that "ACI is nothing more than a holding entity created in order to purchase equipment for the use of Sid Crookston Construction").

54. As soon as ACI began operating in 2016, it hired Julianne as a secretary. Tr. 158:24–159:3, 462:12–18; Ex. 243 at CVB-002596; Exs. 201, 202.

55. ACI provided Julianne with a W-2 and paid her the highest salary of any employee—more than the company's nominal owners. Tr. 158:24–159:8. Exs. 201, 202, 216, 243; *compare* Julianne's biweekly base pay of $4,615.38, *to* Aldon's biweekly base pay of $1,760, Bronson's biweekly base pay of $1,683, and Chris's biweekly base pay of $1,840. Ex. 202 at CHATTERTON-000314 to -316, CHATTERTON-000331. Julianne's salary computes to $119,999.88 per year ($4,615.38 times 26) and was paid for approximately five years from 2016 until her death in 2021, for a total of about $600,000.

56. Despite her high salary, Julianne did not perform much work for ACI. Tr. 398:3–4, 540:10–20, 542:1–4. Indeed, many of ACI's employees either did not know that she worked for the company or did not know what her job duties were. Tr. 23:3–5, 251:11–13, 398:3–4, 502:1–12, 542:1–4.

57. In this litigation, the Estate stipulates that "[a]ll amounts paid by ACI Construction, Inc. in respect of the Naomi Circle property shall be considered as if such amounts were paid by the tax debtor Sid Crookston Construction, Inc." Dkt. No. 162.

58. ACI made $26,567.38 in property tax payments for the Naomi Circle property. Dkt. No. 162 (Trial Stipulation); Exs. 235, 223.

59. ACI also paid for utilities and incidental expenses for the Naomi Circle property. Exs. 252, 251, 243 at CVB-002597, 301 at CROOKSTON-00002396; Tr. 479:21-480:4.

*H. In 2015, Julianne Begins to Receive Substantial Funds from her Family*

60. Julianne received the annual federal gift tax exclusion from each parent for each tax year. Tr. 195:4–6, 385:13–386:18.

61. When LeGrand Johnson Construction was sold in 2015, Julianne received $722,000. Tr. 193:8–16. She invested these proceeds with Brent Skinner of Logan, who invested in real estate on her behalf. Tr. 162:3–19, 193:17–24.

62. Julianne also received trust income, including a distribution of $106,000 from the T-12 trust in 2017. Tr. 198:7–9.

63. Julianne received a distribution of $125,518.65 from the T-14 trust in 2018. Tr. 198:17–23.

64. From the T-Janice Trust, Julianne received the following distributions: $14,000 in 2018; $133,332 in 2019; $200,000 in 2020, and $261,000 in 2021.

65. Julianne also obtained funds when she sold her prior home at Quail Way to her parents. Tr. 415:18–22

66. By 2015, Julianne received enough passive income to make the mortgage payments for the Naomi Circle property. Tr. 195:22–25.

67. Julianne maintained a separate account at Washington Federal bank. Tr. 185:9–12, 187:1–5, 202:2. Over the years, Julianne paid $322,000 in mortgage payments from her individual Washington Federal account. Ex. 15, Tr. 206:12–14.

68. Between the time that the Estate took over the mortgage obligation and the date of the bench trial in this case in September 2025, the Estate paid a total of $204,097 toward the mortgage obligation. Tr. 75:3–7, 205:1–8.

69. The payments made by Julianne and the Estate total $526,097.

*I. In 2018, the IRS Recorded a Tax Lien Against the Naomi Circle Property. In 2021, Julianne initiated this litigation.*

70. In May 2018, the IRS recorded a Notice of Federal Tax Lien against the Naomi Circle property for Julianne as the nominee of Sid Crookston Construction. Dkt. No. 87-045.

71. In July 2021, Julianne sued the United States, asserting a claim to quiet title to the property. Dkt. No. 2.

72. In October 2021, Julianne passed away. Dkt. No. 13. Her Estate was substituted as the plaintiff in this litigation. Dkt. No. 17.

73. The government filed counterclaims against the Estate, Sid, and Sid Crookston Construction,[3] asserting a right to foreclose on the tax liens on the property. Dkt. No. 30.

74. The government later filed a motion for summary judgment in its favor. The court granted the motion in part, ruling that Sid Crookston Construction held an equitable lien for the payments that it made toward the mortgage and the property taxes for the home, totaling $155,321.11. The court denied summary judgment to the extent that the government sought to enforce the tax liens on the property for additional amounts. Dkt. No. 123.

75. The court held a bench trial on the remaining issues.

## CONCLUSIONS OF LAW

When a taxpayer fails to pay an assessed tax after receiving notice and demand for payment, a lien automatically arises in favor of the United States upon "all property and rights to property, whether real or personal," belonging to the taxpayer. 26 U.S.C. § 6321. In determining

[3] Although the government names the Estate, Sid, and Sid Crookston Construction as defendants in its crossclaims and third-party claims, it does not seek a money judgment against them. They are defendants in this action only to the extent that they have an interest in the Naomi Circle property.

whether a tax lien attaches to a piece of property, courts "look initially to state law to determine what rights the taxpayer has in the property the Government seeks to reach, then to federal law to determine whether the taxpayer's state-delineated rights qualify as 'property' or 'rights to property' within the compass of the federal tax lien legislation." *United States v. Craft*, 535 U.S. 274, 278 (2002) (citation omitted).

The crux of the dispute between the Estate and the government is whether Sid Crookston Construction holds a property right to the Naomi Circle home such that the liens for the company's unpaid taxes attach to the property. The government argues that Sid Crookston Construction has rights to the entire value of the Naomi Circle home under four separate theories under Utah law: constructive trust/equitable lien, purchase money resulting trust, nominee theory, and fraudulent transfer. The United States further contends that the rights established under these theories constitute "rights to property" that justify the tax liens and that the liens should apply to the entire value of the home. The Estate concedes that Sid Crookston Construction has an equitable lien on the home. But it asserts that the lien is limited to $181,888.49.

The court examines each of the government's four theories for enforcing the tax liens in turn.

## I. CONSTRUCTIVE TRUST/EQUITABLE LIEN

### *A. Utah Law*

Constructive trusts and equitable liens are closely related, but distinct, doctrines. A constructive trust conveys to the plaintiff title to and the right to possess a piece of property. *Rawlings v. Rawlings* (*Rawlings II*), 358 P.3d 1103, 1110–11 (Utah 2015). An equitable lien, on the other hand, gives the plaintiff a security interest in a portion of the value of a piece of property. *Id.* Because constructive trusts and equitable liens are both designed to remedy unjust enrichment,

*compare* RESTATEMENT (FIRST) OF RESTITUTION § 160 (1937) *with id.* § 161, the test for imposing a constructive trust or an equitable lien is the same, *see McAnulty v. Standard Ins. Co.*, 81 F.4th 1091, 1108 (10th Cir. 2023) ("[W]hen imposed to prevent unjust enrichment, an equitable lien is a special and limited form of a constructive trust." (citation omitted)). The difference between the two doctrines lies in the nature of the remedy rather than the test for imposing it. Accordingly, the court treats caselaw discussing constructive trusts and equitable liens interchangeably.

The government argues that Sid Crookston Construction is entitled to a constructive trust over the entire Naomi Circle property. The Estate contends that the government is entitled to only an equitable lien against a portion of the value of the property. "A constructive trust is an equitable remedy to prevent unjust enrichment," *In re Hock's Est.*, 655 P.2d 1111, 1114 (Utah 1982), and is "usually imposed where injustice would result if a party were able to keep money or property that rightfully belonged to another," *Wilcox v. Anchor Wate, Co.*, 164 P.3d 353, 362 (Utah 2007). Likewise, "[a]n equitable lien is a creature of equity, is based on the equitable doctrine of unjust enrichment, and is the right to have a fund or specific property applied to the payment of a particular debt." *Caldwell v. Armstrong*, 342 F.2d 485, 490 (10th Cir. 1965).

Courts may impose a constructive trust or an equitable lien where (1) an individual or entity has been unjustly enriched and (2) the unjust enrichment can be traced to specific property. *See Rawlings v. Rawlings* (*Rawlings I*), 240 P.3d 754, 767 n.62 (Utah 2010).[4] In order to prove unjust

---

[4] There is some inconsistency in Utah case law regarding the elements of a constructive trust or an equitable lien. In 2007, the Utah Supreme Court held that a third requirement must be satisfied to impose a constructive trust or equitable lien: a wrongful act. *Wilcox v. Anchor Wate, Co.*, 164 P.3d 353, 362 (Utah 2007) ("Courts recognize a constructive trust as a matter of equity where there has been (1) a wrongful act, (2) unjust enrichment, and (3) specific property that can be traced to the wrongful behavior."). In 2010, that court stated in a footnote that the wrongful act element should be employed only in situations that are analogous to a preferential payment to a creditor under

enrichment, a plaintiff must show "(1) a benefit conferred on one person by another; (2) an appreciation or knowledge by the conferee of the benefit; and (3) the acceptance or retention by the conferee of the benefit under such circumstances as to make it inequitable for the conferee to retain the benefit without payment of its value." *Jeffs v. Stubbs*, 970 P.2d 1234, 1248 (Utah 1998) (citation omitted) (cited by *Rawlings I*, 240 P.3d at 765-66). If a constructive trust or an equitable lien would alter a deed to real property, the constructive trust/equitable lien elements must be proven by clear and convincing evidence. *Goggin v. Goggin*, 267 P.3d 885, 892 (Utah 2011). Because the tax liens on the Naomi Circle home affect the title to the property, the clear and convincing evidence standard applies to this case.

In its order on the summary judgment motion, the court ruled that the government was entitled to an equitable lien against the Naomi Circle property for direct payments that Sid Crookston Construction made toward the mortgage and property taxes, totaling $155,321.11. After the bench trial, the government argued that the court should impose a constructive trust equal to the entire value of the property. Alternatively, the government argued that the court should impose an equitable lien for a percentage of the total value of the property. The court first addresses whether the government is entitled to an equitable lien for alleged contributions toward the value of the Naomi Circle property. The court then addresses the government's contention that it is

---

bankruptcy law. *Rawlings I*, 240 P.3d at 767 n.62. But in 2011, the Utah Supreme Cout quoted the three-part constructive trust test articulated in *Wilcox* without cabining the application of the wrongful act element to cases involving an allegation of a preferential payment to a creditor. *Goggin v. Goggin*, 267 P.3d 885, 892 (Utah 2011). Because *Goggin* did not specifically address or even acknowledge the *Rawlings I* footnote, this court concludes that the *Goggin* court did not intend to overrule the specific holding of *Rawlings I* strictly limiting the applicability of the wrongful act element. Because this case does not involve an allegation of a preferential payment to a creditor, the court applies the two-prong, *Rawlings I* test.

entitled to constructive trust for the entire value of the property or, in the alternative, a percentage of the value of the property.

1) The $3,349 Payment Toward the Purchase-Money Loan

The government argues that the $3,349 payment that Sid Crookston Construction made toward interest and fees for the purchase-money loan for the undeveloped lot justifies an equitable lien. The court disagrees. Sid Crookston Construction made the $3,349 payment in August 2008. But the company did not fall behind on its tax obligations until 2009. Although Sid likely abused the corporate form by directing his company to pay his personal expenses for the purchase-money loan, Sid Crookston Construction was not syphoning away assets in order to avoid paying overdue taxes. Under these circumstances, the government is not entitled to an equitable lien for amounts that Sid Crookston Construction contributed toward the purchase money loan. *Cf. Arlin Geophysical Co. v. United States*, No. 2:08-cv-00414-DN-EJF, 2018 WL 4621748, at *8–9 (D. Utah Sept. 26, 2018), *aff'd,* 946 F.3d 1234 (10th Cir. 2020) (ruling that the requirements for a constructive trust under Utah law had been satisfied where a delinquent tax payer funneled money into corporate entities in an effort to avoid paying his tax bill *after* he had failed to pay his taxes).

2) Contributions of Unpaid Labor Toward Construction of the Home

a) Sid, Chris Crookston, and Bronson Twitchell

Sid worked on the Naomi Circle home that he would share with his wife, Julianne. But the government did not present evidence that Sid Crookston Construction paid him for his labor. Thus, there is no evidence that Sid Crookston Construction conveyed a benefit that would attach to the property. Instead, the court finds that Sid spent time working on a home for himself and his wife in his personal capacity.

Chris Crookston, on the other hand, admitted that Sid Crookston Construction paid him for at least some of the time that he spent working on the home. And Bronson Twitchell testified that he could not remember whether he was paid for his work on the home. The government, however, did not provide any evidence of how much compensation Chris or Bronson may have received for their labor. Nor did the government submit any evidence that would allow the court to reasonably estimate the value of their labor. Absent any evidence to support its claim, the government did not shoulder its burden of showing by clear and convincing evidence that an equitable lien is warranted.

b) Jason Mohr's Construction Crew

The government provided evidence that Sid Crookston Construction paid Jason Mohr and his crew of up to ten employees for their work on the Naomi Circle home. Additionally, Mohr provided an estimate of the total number of hours that he and his crew spent working on the home and their hourly rates. Using these estimates, the Estate contends that the contribution of Mohr and his crew to the value of the home was $64,400. The court concludes that this evidence is sufficient to justify an equitable lien for this amount.

The first element of an equitable lien has been satisfied because the evidence shows that Julianne was unjustly enriched. By contributing free labor toward the construction of Julianne's home, Sid Crookston Construction conferred a benefit to Julianne. Moreover, Julianne knew that she had received this benefit. In support of her construction loan application, Julianne submitted an estimate of construction costs that was created by Sid Crookston Construction. The document included general descriptions of the work to be completed on the house (i.e. electrical, paint and finish carpentry, doors, and floor coverings) and corresponding columns for "material," "labor," and "sub bid" (subcontractor costs). While the "material" and "sub bid" columns included

estimates for the cost of those items, the "labor" column was left blank, indicating that Julianne would not be required to pay those necessary costs of construction. Additionally, Cache Valley Bank created a credit analysis report for Julianne's construction loan application in which the bank noted that the construction costs for the home were low because Julianne would receive construction services free of charge from her father's company, LeGrande Johnson, and her future husband's company, Sid Crookston Construction, totaling about $300,000. Based on this document, the court finds that part of Julianne's pitch for approval of her loan application was her claim that she would receive free services from Sid Crookston Construction. Thus, the court concludes that Julianne knew that she was receiving the benefit of free labor from her husband's company.

The final requirement for unjust enrichment has also been met. A party attempting to prove unjust enrichment must show that it would be inequitable for the recipient of a benefit to retain the benefit without payment of its value. *Jeffs*, 970 P.2d at 1248. At the time that Julianne received the benefit of free labor from Mohr and his crew, Sid Crookston Construction had stopped paying its taxes. Thus, Sid was diverting assts from his company to his wife at the same time that Sid Crookston Construction was dodging its federal tax bills. Under these circumstances, it would be inequitable for Julianne's Estate to retain the benefit of labor toward the construction of her home without payment of its value.

The government has also satisfied the second element of an equitable lien: tracing the unjust enrichment to specific property. The labor provided by Mohr and his crew was literally foundational to the construction of the home and, therefore, contributed to the present value of the property.

Because the government has established the elements of an equitable lien against the Naomi Circle property, the court imposes a lien for the estimated value of the labor provided by Mohr and his crew: $64,400.

3) The Use of Sid Crookston Construction's Equipment

The government has shown that Sid Crookston Construction used its heavy equipment, including a track hoe, loader, dump truck, grader, excavator, skid steer, and walk behinds, to build the Naomi Circle home. It argues that the court should impose an equitable lien for the value of the uncompensated use of this equipment. But the government failed to provide any evidence as to the value of the use of this equipment. Accordingly, it has not proven by clear and convincing evidence that the use of this equipment justifies an equitable lien.

4) The Codale Electric Trade

Sid Crookston Construction took a $27,712.11 draw from the 2008 construction loan to pay for concrete. But the concrete was used by Sid Crookston Construction to construct a building for Codale Electric. In exchange for the concrete, Codale Electric provided materials for electrical work on the Naomi Circle home. The government argues that the court should impose an equitable lien because Sid Crookston Construction sacrificed income from the Codale Electric job in exchange for the materials used to construct the home.

The government's argument misreads the evidence. Although it was certainly unusual to use construction loan funds to buy concrete to trade for electrical equipment, the ultimate source of the money for the equipment was the construction loan in Julianne's name, not Sid Crookston Construction. Although the government mentions its theory that Codale Electric did not pay Sid Crookston Construction for work that it performed, it has not supported this theory with any

evidence. Accordingly, the government has not shown that an equitable lien should be imposed for the electrical equipment provided by Codale Electric.

5) Payments Toward Incidental Homeowner Expenses

Sid Crookston Construction and ACI made payments for utilities, internet service, landscaping, extermination services, and plumbing services for the Naomi Circle property. The government argues that it is entitled to an equitable lien based on these payments.

The court concludes that the government is not entitled to an equitable lien for two reasons. First, the government made no attempt to determine the amounts that Sid Crookston Construction and ACI paid toward utilities and other incidental costs. Absent even an estimate of the amount of these payments, the government cannot satisfy the clear and convincing evidence standard for imposing an equitable lien. Second, payments toward utilities, landscaping, and plumbing services are merely incidental homeowner expenses. They are not sufficiently tied to the value of the Naomi Circle property to satisfy the tracing requirement for an equitable lien. Accordingly, the court will not impose an equitable lien based on payments toward these incidental expenses.

6) ACI's Property Tax Payments

ACI made $26,567.38 in property tax payments for the Naomi Circle property. The Estate stipulates that all amounts paid by ACI should be deemed to be made by Sid Crookston Construction. The Estate further concedes that the court should impose an equitable lien for the property tax payments made by ACI. Dkt. No. 177 at 23. Thus, for the same reasons that the court imposed an equitable lien for property tax payments made by Sid Crookston Construction in its summary judgment order, the court also imposes an equitable lien for the $26,567.38 in property tax payments made by ACI.

7) Julianne's ACI Salary

Julianne was by far ACI's highest paid employee, making approximately $600,000 during the time she worked for ACI. Because Julianne did little or no work for ACI to justify this salary, the government has a strong case that Julianne was unjustly enriched by these payments, which were made while Sid Crookston Construction's tax bills went unpaid. But in order to impose an equitable lien against the Naomi Circle property, the court must find by clear and convincing evidence that at least some portion of the ACI salary payments can be traced to that property. *See Rawlings I*, 240 P.3d at 767 n.62. The government has not presented sufficient evidence to satisfy this burden.

The government makes the conclusory assertion that Julianne's ACI salary was "a way to funnel approximately $600,000 from ACI to the Naomi Circle property." Dkt. No. 176 at 37. But it does not point to any evidence to support this conclusion. Nor does it explain how any portion of Julianne's salary can be traced to the property. Moreover, the Estate has presented evidence of an alternative source of funds to pay the mortgage obligation. In 2015, Julianne received $722,000 from her family's sale of its construction business. Beginning in 2017, she also began to receive substantial distributions from various trusts. She also obtained a large sum of money when she sold her Quail Way home to her parents. Based on these independent sources of wealth, Julianne had enough money to make her mortgage payments by the time that she began receiving her ACI salary in 2016. Thus, the government has not met its burden of showing by clear and convincing evidence that Julianne's inflated ACI salary can be traced to the Naomi Circle property. The court, therefore, may not impose an equitable lien as to any portion of this salary.

8) The Government's Constructive Trust Claim

The government's primary contention is that the court should impose a constructive trust over the entire value of the Naomi Circle property, giving it the right to possession of the property. The court concludes that awarding the government a constructive trust would be unjust.

In its summary judgment order, the court found that the government was entitled to an equitable lien in the amount of $155,321.11 for mortgage and property tax payments made by Sid Crookston Construction. In this order, the court concludes that the government is also entitled to an additional lien in the amount of $90,967.38 for the free labor contributed by Mohr and his crew and for property taxes paid by ACI. Thus, the government has proven that it is entitled to an equitable lien in the amount of $246,288.49. This is only a fraction of the $1.5 million valuation of the Naomi Circle property in 2022. Moreover, the government's claim for a constructive trust ignores Julianne's contribution toward the value of the property through the $895,000 construction loan in her name that was used to pay for the lot, building materials, and subcontractors for the construction of the home.[5] Because the government has only proven that it is entitled to an equitable lien for a small portion of the value of the property, the court declines to impose a constructive trust for the entire value of the property.

9) The Government's Partial Constructive Trust Claim

The government argues that if the court does not impose a constructive trust that extends to the entire Naomi Circle property, it should impose a constructive trust that extends to a

[5] Although Sid Crookson Construction paid $134,066.67 toward the debt incurred by Julianne, she and the Estate paid a total of $526,097 in mortgage payments.

percentage of the property so that the government is able to capture any appreciation in its market value. The court denies the government's request to adopt this type of equitable remedy.

The government has not cited any Utah case law supporting it partial constructive trust theory. Indeed, the concept of a partial constructive trust contradicts the defining characteristic of a constructive trust: that it creates an equitable duty to convey title to the property to the plaintiff. *See Rawlings II*, 358 P.3d at 1110. On the other hand, a "trial court is accorded considerable latitude and discretion in applying and formulating an equitable remedy," such as a constructive trust or an equitable lien. *Goggin*, 267 P.3d at 892.

This court need not decide whether Utah law permits what would be best characterized as an equitable lien as to a percentage of a specific property's value because such a remedy would not be appropriate here. The contributions made by Sid Crookston Construction toward the Naomi Circle property were made over a number of years in the form of free labor during the construction of the home and mortgage and property tax payments well after the home was finished. The government has not presented evidence of the value of the property at the numerous points in time when Sid Crookston Construction made these contributions. Accordingly, the court would only be guessing as to an appropriate percentage to award for an equitable lien. Because the court does not have the information necessary to even attempt to arrive at a percentage lien that would be fair, the court declines to do so in this case.

10) Conclusion

The court previously found that Sid Crookston Construction held an equitable lien against the Naomi Circle property in the amount of $155,321.11 for mortgage and property tax payments that it made. Based on the evidence presented in the bench trial, the court now finds that Sid Crookston Construction also holds a $64,400 equitable lien for free labor that it contributed to the

property and an equitable lien in the amount of $26,567.38 for property tax payments made by ACI. Thus, under Utah law, Sid Crookston Construction holds a $246,288.49 equitable lien against the Naomi Circle property.

*B. Federal Law*

Having determined Sid Crookston Construction's right to the Naomi Circle property under Utah law, the court must decide next whether this property right gives rise to a tax lien under federal law.

A tax lien automatically arises upon "all property and rights to property, whether real or personal," belonging to the taxpayer. 26 U.S.C. § 6321. The statutory language of § 6321 "is broad and reveals on its face that Congress meant to reach every interest in property that a taxpayer might have." *Drye v. United States*, 528 U.S. 49, 56 (1999) (citation omitted). Because an equitable lien constitutes a security interest in property held by another, *Rawlings II*, 358 P.3d at 1110–11, it is the type of property interest that gives rise to a tax lien under § 6321, *see G. M. Leasing Corp. v. United States*, 429 U.S. 338, 350–51 (1977) (holding that a tax lien attached to property held in the name of an alter ego of the taxpayer); *In re Krause*, 637 F.3d 1160, 1167 (10th Cir. 2011) (holding that "equitable ownership over . . . fraudulently transferred assets" under Kansas law was "more than enough to render [these] state law interests 'property' or 'rights to property' for purposes of federal law under § 6321"); *Holman v. United States*, 505 F.3d 1060, 1065 (10th Cir. 2007) (holding that "'property' and 'rights to property' [under § 6321] may include 'not only property and rights to property owned by the taxpayer but also property held by a third party if it is determined that the third party is holding the property as a nominee . . . of the delinquent taxpayer.'" (second alteration in original) (citation omitted)). Accordingly, the government has a tax lien in the amount of $246,288.49 against the Naomi Circle property.

## II. PURCHASE MONEY RESULTING TRUST

The government also argues that Sid Crookston Construction had a property interest in the Naomi Circle property through a purchase money resulting trust. "[A] purchase money resulting trust is an equitable remedy designed to implement what the law assumes to be the intentions of the putative trustor." *In re Hock's Est.*, 655 P.2d 1111, 1114 (Utah 1982). "Where a transfer of properties is made to one person and the purchase price is paid by another, a resulting trust arises in favor of the person by whom the purchase price is paid . . . ." *Id.* at 1115 (quoting RESTATEMENT (SECOND) OF TRUSTS § 440 (1959)). But a purchase money resulting trust does not arise "if the person by whom the purchase price is paid manifests an intention that no resulting trust should arise." RESTATEMENT (SECOND) OF TRUSTS § 441. If a resulting trust contradicts a deed, the party alleging the existence of a resulting trust has the burden of proving it by clear and convincing evidence. *Hock's Est.*, 655 P.2d at 1114.

The government has not proven that Sid Crookston Construction has a purchase money resulting trust for the Naomi Circle property. One of the key components of a resulting trust is that the beneficial owner pays the purchase price of the property—either with cash or with a loan taken out in the beneficial owner's name. *See United States v. Tingey*, 716 F.3d 1295, 1303 (10th Cir. 2013) (affirming the district court's finding that a purchase money resulting trust existed under Utah law where the beneficial owner paid the $5,000 deposit, approximately $72,000 for the down payment, and was personally obligated on a promissory note for the balance of the purchase price of a ski cabin); *cf.* RESTATEMENT (SECOND) OF TRUSTS § 456 ("Where a transfer of property is made to one person, and another person at the time of the transfer undertakes an obligation to pay the purchase price, a resulting trust arises in favor of the latter person, unless he manifests an intention that no resulting trust should arise."). The evidence in this case shows that Sid paid for

an undeveloped lot with a $132,000 purchase money loan. About a year later, Sid Crookston Construction paid Cache Valley Bank a total of $3,349 for interest and a modification fee for Sid's purchase-money loan. About three months later Sid transferred title to the lot to his fiancée, Julianne, via quit claim deed. As part of the transaction, Julianne assumed Sid's purchase-money loan. Julianne then obtained an $895,000 construction loan in her own name. Part of the construction loan was used to pay off the $132,000 purchase money loan. Julianne used most of the remainder of the construction loan to build a home on the undeveloped lot.

Thus, Sid Crookston Construction did not pay the purchase price for the Naomi Circle property. Julianne paid the purchase price of the property through funds that she obtained from a construction loan in her own name. The fact that Sid Crookston Construction made an interest payment for Sid's purchase money loan is of no consequence. Sid Crookston Construction made the payment before Julianne acquired title to the lot. Moreover, the $3,349 payment for interest and a small modification fee pales in comparison to the value of the lot and the home that was eventually built on the lot. This payment could not be considered to be the purchase price of the Naomi Circle property.

The government argues that Sid Crookston Construction effectively paid the purchase price of the property years later when it began to make mortgage payments for the property. It also points to the inflated salary that ACI paid Julianne as evidence that Sid Crookston Construction's successor entity siphoned funds to her so that she could make mortgage payments. The government, however, has not proven its mortgage payment theory of payment of the purchase price by clear and convincing evidence. The government has established that Sid Crookston Construction paid a total of $134,066.67 toward Julianne's mortgage payments. But, as discussed above in Part I.A.7, the government has not proven by clear and convincing evidence that

Julianne's inflated ACI salary can be traced to additional mortgage payments. Mortgage payments totaling $134,066.67 on an initial loan for $895,000 are not sufficient to prove that Sid Crookston Construction paid the purchase price for the Naomi Circle property. *See Bill Nay & Sons Excavating v. Neeley Const. Co.*, 677 P.2d 1120, 1122 (Utah 1984) (concluding that a purchase money resulting trust existed where the record contained "ample evidentiary support for the conclusion that [the beneficial owner] provided the entire consideration for the conveyance to [the legal owner]"); *Tingey*, 716 F.3d at 1303 (affirming the district court's finding that a purchase money resulting trust existed under Utah law where the beneficial owner paid the entire down payment and assumed liability for paying off a promissory note for the balance of the purchase price of a property).

Because the government has not proven by clear and convincing evidence that Sid Crookston Construction paid the purchase price for the Naomi Circle property, the court may not impose a purchase money resulting trust in the government's favor. Accordingly, Sid Crookston Construction does not have a property interest in the Naomi Circle property under this equitable theory.

## III. NOMINEE THEORY

The government also asserts that Sid Crookston Construction holds property rights to the Naomi Circle property under what it labels as a nominee theory. The court grants judgment in favor of the Estate on this claim because Utah does not recognize a nominee theory of property rights that is distinct from a constructive trust, equitable lien, or purchase money resulting trust.

The government relies on *Holman v. United States*, 505 F.3d 1060, 1065 (10th Cir. 2007) to support its nominee claim. In that case, the United States placed a tax lien on real property nominally owned by a delinquent taxpayer's wife and a third party as tenants in common. *Id.* at

1063. The federal district court ruled that the tax lien did not attach to the one-half undivided interest in the property held in the wife's name, reasoning that she could not be the taxpayer's nominee because the taxpayer did not convey legal title to the property to his wife. *Id.* at 1064. On appeal, the Tenth Circuit found that the district court erred in ruling that the beneficial owner must directly transfer property to another in order to create a nominee relationship. *Id.* at 1064–66. Citing federal law, that court held that

> an actual transfer of legal title is not essential to the imposition of a nominee lien. A delinquent taxpayer who has never held legal title to a piece of property but who transfers money to a third party and directs the third party to purchase property and place legal title in the third party's name may well enjoy the same benefits of ownership of the property as a taxpayer who has held legal title. In both instances, the third party may be the taxpayer's nominee.

*Id.* at 1065. In a footnote found in this section of the opinion, the Tenth Circuit quoted the following language from a Sixth Circuit case:

> "Many courts use six factors in evaluating nominee questions: (1) whether inadequate or no consideration was paid by the nominee; (2) whether the property was placed in the nominee's name in anticipation of a lawsuit or other liability while the transferor remains in control of the property; (3) whether there is a close relationship between the nominee and the transferor; (4) whether they failed to record the conveyance; (5) whether the transferor retained possession; and (6) whether the transferor continues to enjoy the benefits of the transferred property."

*Id.* at 1065 n.1 (quoting *Spotts v. United States*, 429 F.3d 248, 253 n.2 (6th Cir. 2005)).

In a separate section of its opinion, the *Holman* court went on to hold that the district court had failed to analyze whether the taxpayer had a property right under Utah law: "[T]he district court did not resolve the question of whether [the taxpayer] had an interest in the Centerville property under Utah law and, if so, whether the IRS's nominee lien could be enforced as a matter of federal law." *Id.* at 1067. Accordingly, the Tenth Circuit remanded the case to the district court

with instructions to determine whether the taxpayer had an interest in the property under Utah law. *Id.* In so doing, the *Holman* court cited three cases applying purchase money resulting trust and constructive trust theories under Utah law. *Id.* at 1068 (citing *Parks v. Zions First Nat. Bank*, 673 P.2d 590, 598–600 (Utah 1983); *In re McGavin*, 189 F.3d 1215, 1217–19 (10th Cir. 1999); *In re Taylor*, 133 F.3d 1336, 1341 (10th Cir. 1998)).

Focusing on the footnote quoting the Sixth Circuit *Spotts* opinion, the government argues that this court should apply the six *Spotts* factors to determine whether Sid Crookston Construction holds a property right to the Naomi Circle property under a nominee theory. But the Tenth Circuit did not purport to declare Utah law when it quoted the Sixth Circuit *Spotts* factors. Indeed, the section of the opinion where the footnote is located is bereft of any discussion of or citation to Utah law. Instead, the *Holman* court found that the district court had failed to analyze the issue of property rights under Utah law and directed the lower court to do so while citing cases applying resulting trust and constructive trust theories. In short, *Holman* did not establish or endorse a separate nominee theory of property rights under Utah law.

The government asserts that *In re Krause*, 637 F.3d 1160 (10th Cir. 2011) and *Free v. Farnworth*, 144 P.2d 532 (Utah 1943) support its contention that Utah recognizes a nominee theory of property rights. But *Krause* is a case in which the Tenth Circuit analyzed a claim of fraudulent conveyance to a nominee under Kansas law. *Krause*, 637 F.3d at 1167. That case has nothing to do with Utah property law. In *Free v. Farnworth*, 144 P.2d 532, 535 (Utah 1943), the Utah Supreme Court held that a property owner that neglects to pay property taxes cannot purchase the property at a tax sale through a nominee and take the property free of mortgages or other liens. Specifically, that court reasoned:

> The tax statutes are not designed to permit an owner of land who has a duty to pay the taxes, to neglect the performance of such duty until tax delinquencies mature into a tax title, and then purchase the tax title to wipe out his obligations to mortgagors or other lienholders. . . . The owner of property can work no different result by using some third person as a nominee or instrumentality.

*Id. Free* focused on whether liens on property survived a tax sale to a nominee. The Utah Supreme Court did not announce a test or factors to consider for determining whether a property is held by a nominee in name only. Nor did it establish a separate theory of nominee property ownership.

In sum, Utah law does not recognize a separate nominee theory. Nor have Utah courts adopted the nominee factors mentioned in the *Holman* footnote. Accordingly, the United States cannot establish a property right under its proposed nominee theory.

## IV. THE UTAH UNIFORM FRAUDULENT TRANSFER ACT

Finally, the government argues that Sid Crookston Construction has a property interest in the Naomi Circle property under Utah's Uniform Fraudulent Transfer Act. The version of the Act in force in 2008, when the government alleges that the fraudulent transfer occurred, provides:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> (a) with actual intent to hinder, delay, or defraud any creditor of the debtor; or
>
> (b) without receiving a reasonably equivalent value in exchange for the transfer or obligation; and the debtor:
>
> (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>
> (ii) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

UTAH CODE § 25-6-5(1) (2008). In 2008, a fraudulent transfer claim had to be proven by clear and convincing evidence. *Jones v. Mackey Price Thompson & Ostler*, 469 P.3d 879, 890 (Utah 2020).

The government contends that Sid Crookston Construction is Sid's alter ego and that Sid's personal assets should be deemed to be the assets of Sid Crookston Construction. Based on this premise, it further asserts that Sid's November 2008 transfer of the unimproved lot to Julianne was a fraudulent transfer of an asset of Sid Crookston Construction. The government argues that because the transfer was fraudulent, Sid Crookston Construction retained an interest in the Naomi Circle property such that the tax liens attach to the property. Setting aside the question of whether Sid's assets should be deemed to be Sid Crookston Construction's assets under the alter ego theory asserted by the government, the court finds that it has not proven that the 2008 transfer was fraudulent.

First, the government has not proven that Sid transferred the lot to Julianne "without receiving a reasonably equivalent value in exchange for the transfer." UTAH CODE § 25-6-5(1)(b) (2008). In July 2007, Sid paid for an undeveloped lot with a $132,000 purchase-money loan from Cache Valley Bank. In August 2008, Sid Crookston Construction paid Cache Valley Bank a total of $3,349 for interest and a modification fee for Sid's purchase-money loan. In November 2008, Sid transferred title to the lot to his fiancée, Julianne, via quit claim deed. As part of the transaction, Julianne assumed liability for the purchase-money loan. Julianne then obtained an $895,000 construction loan in her name and discharged the purchase-money loan, which had a balance of

$134,236.69, with funds from the construction loan. The Estate presented credible evidence that the lot was worth about $120,000 when Julianne acquired it.[6]

Thus, the transaction consisted of Sid transferring a lot worth $120,000 to Julianne in exchange for Julianne assuming Sid's $134,236.69 loan for the lot. Sid did not transfer the deed to Julianne "without receiving a reasonably equivalent value in exchange for the transfer." UTAH CODE § 25-6-5(1)(b) (2008). Indeed, Sid came out ahead on the deal by receiving relief from a $134,236.69 loan obligation for what was at that time a depreciating asset. Even if the court deems this transaction to be a transfer of the lot from Sid Crookston Construction to Julianne under an alter ego theory, the court finds that Sid Crookston Construction received reasonably equivalent value for the transfer of the lot in the form of debt relief.

Second, the government has failed to prove by clear and convincing evidence that Sid transferred the lot with "actual intent to hinder, delay, or defraud any creditor" for the same reasons discussed above. See UTAH CODE § 25-6-5(1)(a) (2008). Because the lot was underwater, it had no value as an asset that a creditor could seize. Thus, the court finds that Sid did not intend to defraud any creditor by transferring it to Julianne.

Because the government has not proven either a transfer without an exchange of reasonably equivalent value or an actual intent to defraud creditors, it cannot prevail on its fraudulent transfer claim.

---

[6] The court takes judicial notice of the fact that Sid purchased the lot just before the Great Recession hit in late 2007, causing real estate prices to plunge sharply.

## V. FORECLOSURE

As discussed above, the court concludes that Sid Crookston Construction has an equitable lien against the Naomi Circle property in the amount of $246,288.49. The government argues that the court should order foreclosure of the tax liens on the Naomi Circle property so the property can be sold to satisfy the tax liens up to the amount of the equitable lien.

Under federal statute, this court has the discretion to order the sale of property in order to enforce a tax lien. 26 U.S.C. § 7403(c) ("The court . . . may decree a sale of such property [subject to a valid tax lien] . . . ."); *United States v. Rodgers*, 461 U.S. 677, 708 (1983) (holding that courts have "a degree of equitable discretion" when deciding whether to order a foreclosure sale pursuant to § 7403(c)); *United States v. Hershberger*, 475 F.2d 677, 679 (10th Cir. 1973) (holding that "it is up to the courts to decide whether to foreclose a tax lien"). The Restatement (First) of Restitution also indicates that courts have flexibility in crafting orders to satisfy an equitable lien:

> Where the equitable lien is upon other property the court will ordinarily decree that unless the holder of the property pays the amount of the lien the property be sold and out of the proceeds the amount of the lien be paid. Where, however, the person holding the property is not at fault, and where the foreclosure of the lien by a sale of the property would cause a hardship to the holder of the property, the court will not necessarily order an immediate sale of the property.

RESTATEMENT (FIRST) OF RESTITUTION § 161 (1937), cmt. b.

There are equitable considerations that weigh both for and against foreclosure. On one hand, the fact that the government is entitled to a lien against the property for only a fraction of its value weighs against foreclosure. On the other hand, foreclosure advances the government's "paramount interest in prompt and certain collection of delinquent taxes." *Rodgers*, 461 U.S. at 711. Balancing these considerations, the court finds that foreclosure is an appropriate remedy in

this case. But the court also determines that the estate should be afforded a reasonable period of time to satisfy the tax liens in order to avoid a foreclosure sale. Accordingly, the court orders that the government shall not initiate a foreclosure sale until January 5, 2027. If the Estate has not fully satisfied the tax liens against the property by this date, the government may proceed with the judicial sale of the property in accordance with 26 U.S.C. § 7403(c) without further order of the court. The Estate may move to extend this stay of forfeiture pursuant to Rule 62(b) of the Federal Rules of Civil Procedure.

**CONCLUSION**

For the above stated reasons, the court concludes that the United States may enforce the tax liens on the Naomi Circle property up to a total of $246,288.49. The court orders forfeiture of the property, but the government may not initiate a forfeiture sale until January 5, 2027.

DATED September 30, 2026.

BY THE COURT

Jill N. Parrish
Chief Judge District of Utah